**THE ALTMAN LAW GROUP**
BRYAN C. ALTMAN (State Bar No. 122976)
DAVID J. MASUTANI (State Bar No. 172305)
8484 Wilshire Blvd. Suite 510
Beverly Hills, California 90211
Telephone: (323) 653-5581
Fax: (323) 653-5542

Attorneys for Plaintiff Kahn Creative
Partners, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAHN CREATIVE PARTNERS, INC., an Illinois corporation, Plaintiff, vs. NTH DEGREE, INC. aka BEYOND THE NTH DEGREE, INC., a Delaware corporation; and DOES 1 through 10, inclusive, Defendants. | Case No.  CV 10-932 JST (FFMx) [Assigned to the Hon. Josephine Staton Tucker] **PLAINTIFF KAHN CREATIVE PARTNERS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** **(F.R.C.P. Rules 56, 58, Local Rule 56-1)** [*Filed concurrently with Memorandum of Points and Authorities, Statement of Genuine Disputes and Additional Material Facts, Compendium of Evidence, and Proposed Order*] |

Date:            March 28, 2011
Time:            10:00 a.m.
Courtroom:   10A

Complaint Filed:  February 8, 2010
Trial Date:        May 10, 2011

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . .   iii

1. INTRODUCTION . . . . . . .   1

2. SUMMARY OF THE RELEVANT FACTS . . .   2

    A. Nth is made aware that the RSA Conferences will be put to bid and of its competition for the contracts .   2

    B. Nth seeks to partner with KCP to become equal to the other bidders . . . . . .   2

    C. The terms of the Nth and KCP partnership . .   3

    D. Further evidence supporting the implied/oral partnership . . . . . . .   4

    E. RSAC issues the official RFP . . . .   5

    F. The parties joint effort in preparing and submitting the response to the RFP . . . . .   6

    G. The RFI issues splitting off the marketing work – Nth and KCP do not alter their course . .   7

    H. KCP prepares for and presents most of the partnership's face-to-face presentation in support of the RFP before RSAC . . . . .   9

    I. Although the partnership's proposal won the RFP process, Nth steals the work awarded for itself .   11

3. LEGAL ARGUMENTS . . . . . .   11

A. THERE ARE GENUINE TRIABLE ISSUES OF MATERIAL FACTS REGARDING THE EXISTENCE OF AN ORAL OR IMPLIED PARTNERSHIP AGREEMENT OR JOINT VENTURE AGREEMENT BETWEEN KCP AND NTH. (2ND, 3RD, 4TH AND 5TH CLAIMS FOR BREACH OF ORAL/IMPLIED PARTNERSHIP OR JOINT VENTURE AGREEMENTS) . . . . .   12

    1. That KCP's principals used the term "partner" in other contexts in other situations is wholly irrelevant .   14

    2. There was a community of interest between Nth and KCP until Nth usurped the RFP work for itself . .   15

i

3.   The parties entered into contracts with third parties on behalf of the partnership .   .   .   .   .   .   .   15

4.   Lowe and the Nth team managed preparation of the response to the RFI and RFP   .   .   .   .   .   16

5.   The parties agreed to share profits evenly - But even if there was no express agreement regarding profits, that is not evidence that there is no partnership   .   .   .   16

B.   BECAUSE THERE ARE TRIABLE ISSUES OF MATERIAL FACT REGARDING THE EXISTENCE OF PARTNERSHIP/ JOINT VENTURE, THERE ARE TRIABLE ISSUES OF FACT REGARDING THE (7TH) CLAIM FOR BREACH OF FIDUCIARY DUTY .   .   .   .   .   .   17

C.   THE CONTRACT WAS SUFFICIENTLY CERTAIN TO PROVIDE A BASIS FOR DETERMINING THE EXISTENCE OF A BREACH AND FOR GIVING AN APPROPRIATE REMEDY (1st CLAIM FOR BREACH OF CONTRACT).   .   .   .   .   .   18

1.   The Statute of Frauds is Not Applicable - The contract could have been performed within a year   .   .   .   19

D.   THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (8TH CLAIM) SURVIVES BECAUSE A CONTRACT EXISTS AND NTH TOOK UNFAIR ADVANTAGE OF KCP   .   .   20

E.   NTH HAS BEEN UNJUSTLY ENRICHED BY KCP'S PREPARATION OF THE BUSINESS ACUMENT SECTION TO THE WRITTEN RFP PROPOSAL AND ITS PRESENTATION OF THE STRATEGIC THINKING AT THE FACE-TO-FACE PRESENTATION THAT WON NTH THE RFP BUSINESS. (9TH CLAIM)   .   .   .   21

F.   KCP'S PROMISSORY ESTOPPEL CLAIM SURVIVES AS NTH CLEARLY INDUCED KCP TO RESPOND, IN WRITING AND IN PERSON, FOR THE RFP WORK. (6TH CLAIM)   .   .   .   .   .   .   22

G.   THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER NTH'S ACTIONS WERE UNFAIR, UNLWAFUL AND/OR FRAUDULENT IN VIOLATION OF BUSINESS & PROFESSIONS CODE § 17200 (10TH CLAIM)   .   .   .   .   .   22

4.   CONCLUSION   .   .   .   .   .   .   24

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Albertoni v. Alberti,*
104 Cal.App. 633, 286 P. 473 (1930) . . . . 17

*Anderson v. Liberty Lobby, Inc.,*
477 US 242, 106 S.Ct. 2505 (1986) . . . . 11, 12

*Bank of the West v. Superior Court,*
2 Cal.4th 1254, 10 Cal.Rptr.2d 538 (1992) . . . 23

*Bustamante v. Intuit, Inc.,*
141 Cal.App.4th 199, 45 Cal.Rptr.3d 692 (2006) . . 18, 19

*C & K Engineering Contractors v. Amber Steel Co.,*
23 Cal.3d 1, 151 Cal.Rptr. 323 (1978) . . . 22

*Cochran v. Board of Supervisors,*
85 Cal.App.3d 75, 149 Cal.Rptr. 304 (1978) . . 13, 14

*Constans v. Ross,*
106 Cal.App.2d 381, 235 P.2d 113 (1951) . . . 16

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
504 US 451, 112 S.Ct. 2072 (1992) . . . 12

*Ersa Grae Corp. v. Fluor Corp.,*
1 Cal.App.4th 613, 2 Cal.Rptr.2d 288 (1991) . . 18

*First Nationwide Savings v. Perry,*
11 Cal.App.4th 1657, 15 Cal.Rptr.2d 173 (1992) . . 21

*Foley v. Interactive Data Corp.,*
47 Cal.3d 654, 254 Cal.Rptr. 211(1988) . . . 20

*Holmes v. Lerner,*
74 Cal.App.4th 442, 88 Cal.Rptr.2d 130 (1999) . . 13, 16

*Kovacik v. Reed,*
49 Cal.2d 166, 315 P.2d 314 (1957) . . . 17

*Ladas v. California State Auto. Assn.,*
19 Cal.App.4th 761, 23 Cal.Rptr.2d 810 (1993) . . 18

*Motors, Inc. v. Times Mirror Co.,*
102 Cal.App.3d 735, 162 Cal.Rptr. 543 (1980) . . 23

Page

## CASES

*Moulin v. Der Zakarian,*
    191 Cal.App.2d 184, 12 Cal.Rptr. 572 (1961) . . 16

*Nelson v. Abraham,*
    29 Cal.2d 745, 177 P.2d 931 (1947) . . . . 13, 20

*Orlopp v. Willardson Co.,*
    232 Cal.App.2d 750, 43 Cal.Rptr. 125 (1965) . . 13

*Peterson v. Celico Partnership,*
    164 Cal.App.4th 1583, 80 Cal.Rptr.3d 316 (2008) . . 21

*People v. McKale,*
    25 Cal.3d 626, 159 Cal.Rptr. 811 (1979) . . . 22

*Ramos v. Pacheco,*
    64 Cal.App.2d 304, 148 P.3d 704 (1944) . . . 15

*Robinson & Wilson, Inc. v. Stone,*
    35 Cal.App.3d 396, 110 Cal.Rptr. 675 (1973) . . 18

*Saunders v. Superior Court,*
    27 Cal.App.4th 832, 33 Cal.Rptr.2d 438 (1994) . . 23

*Singleton v. Fuller,*
    118 Cal.App.2d 733, 259 P.2d 687 (1953) . . . 16

*Swanson v. Siem,*
    124 Cal.App. 519, 12 P.2d 1053 (1932) . . . 13, 14

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,*
    809 F2d 626 (9th Cir. 1987) . . . . . 12

*United States v. Bloom,*
    112 F3d 200 (5th Cir. 1997) . . . . . 12

*United States v. One Parcel of Real Property,*
    904 F2d 487 (9th Cir. 1990) . . . . . 12

*United States v. One Tintoretto Painting,*
    691 F2d 603 (2nd Cir. 1982) . . . . . 12

*Weddington Productions, Inc. v. Flick,*
    60 Cal.App.4th 793, 71 Cal.Rptr.2d 265 (1998) . . 18

*Weiner v. Fleischman,*
    54 Cal.3d 476, 286 Cal.Rptr. 40 (1991) . . . 13, 14

iv

Page

CASES

Westcott v. Gilman,
    170 Cal. 562, 150 P. 777 (1915)    .    .    .    .    14, 15

STATUTES and RULES

Business and Professions Code section 17200    .    .    .    22

California Civil Code §1624    .    .    .    .    .    .    23

California Corporations Code section 16202    .    .    12, 13, 14, 16

California Corporations Code section 16401    .    .    .    16, 17

Federal Rules of Civil Procedure Rule 56    .    .    .    .    11

Rest.2d Contracts, § 33    .    .    .    .    .    .    18

9 Witkin, Summary of Cal. Law, Partnership, § 17 .    .    .    13, 17

1 | **1.    INTRODUCTION**

2 | In this case, Plaintiff Kahn Creative Partners, Inc. ("KCP") has alleged and
3 | contends that it and Defendant Nth Degree, Inc. ("Nth") entered into an agreement
4 | whereby the two companies agreed: (1) to jointly prepare a proposal in response to
5 | the Request for Proposal ("RFP") and the Request for Information ("RFI") issued by
6 | RSA Conference ("RSAC");  and (2) to share in the work and profits resulting from
7 | winning the RFP and/or the RFI. Nth, on the other hand, contends that it never
8 | intended to share work associated with the RFP with KCP.  Rather, it contends that it
9 | applied for the RFP work solely for itself as a stand-alone entity and that KCP
10 | applied for the RFI work solely for itself as a stand-alone entity.

11 | The parties are as diametrically opposed with respect to their contentions as
12 | they are in their interpretation of the facts.  This complete disagreement between the
13 | parties to this matter points inexorably to the conclusion that there are a significant
14 | number of material and triable issues of fact in dispute.

15 | For example, if Nth contends that it never intended for KCP to participate in
16 | any of the RFP work or profits, why did it specifically solicit and request KCP to
17 | prepare sections in the RFP response relating to the responding bidder's "Business
18 | Acumen," particularly since that was not asked for by RSAC in the RFI response?
19 | Further, in the face-to-face presentation before RSAC in connection with the RFP,
20 | why did Nth designate three members of KCP as being members of the "day-to-day
21 | team" that would do the RFP work, and why did Nth have KCP prepare almost the
22 | entire script for that presentation?

23 | As demonstrated above, more particularly below, and in KCP's Statement of
24 | Genuine Disputes and Additional Facts filed concurrently herewith which points out
25 | numerous errors in Nth's Statement of Uncontroverted Facts, there exists **multiple**
26 | triable issues of material facts with respect to **each** of the ten causes of action alleged
27 | in KCP's complaint.  As a result, Nth's motion for summary judgment or summary
28 | adjudication must be denied in its entirety.

-1-

## 2.   SUMMARY OF THE RELEVANT FACTS

Nth is a is a global event marketing and management company which since 2004 had held the contracts for management of the U.S. and European RSA Conferences, which are multi-day conferences held by RSA Conference ("RSAC") for the security-technology industry. (Nth's Uncontroverted Fact ("UF") No. 1) RSAC is one of Nth's biggest, if not its biggest, clients. (KCP's Additional Material Fact ("AMF") No. 1)

### A.   Nth is made aware that the RSA Conferences will be put to bid and of its competition for the contracts.

In the summer of 2008, Robert Lowe, Event Architect at Nth and Nth's main contact with RSAC, had learned from RSAC's general manager, Sandra Toms-Lapedis ("Lapedis"), that RSAC's parent company, EMC, wanted the contracts that Nth held to be put up for bid in a Request for Proposal ("RFP") process. (AMF 2) Lowe understood that Nth's competition in the bidding process would likely include Jack Morton World Wide ("JMWW") and George P. Johnson ("GPJ"), the two international marketing and event management industry giants that have the resources to provide marketing, creative, strategy, brand extension, and event architecture, all within their organizations. In other words, JMWW and GPJ offered RSAC the option of a "one stop shop" in which all aspects of the RSAC could be handled within a single organization. (AMF 3)

### B.   Nth seeks to partner with KCP to become equal to the other bidders.

Desperate to compete with JMWW and GPJ on their playing field, Nth sought out a company with which it could partner that would bring to the table skills, experience and insights that Nth did not have, so that it too could bid for all of the work being put to bid by RSAC as a "one stop shop." (AMF 4) As a result, in or around June of 2008, Lowe contacted Sharon Weber ("Weber"), a principal of KCP and his former manager at JMWW, to inquire about an opportunity to work with Nth

-2-

1  regarding in connection with the RSA Conferences. (AMF 5)

2      Discussions of the relationship between Nth and KCP being a partnership
3  began in early conversations and emails between Lowe and Weber.  On July 18,
4  2008, Weber sent an email to Lowe in which she stated, "...[Kahn and I] are both
5  interested in talking to you further about a ***strategic partnership*** around the RSA
6  (and possibly beyond)."  (Emphasis added.) (AMF 6)

7      Those initial contacts led to a meeting held on August 6, 2008, involving
8  representatives from Nth and KCP in Las Vegas to discuss Nth's partnership idea for
9  KCP to work with Nth in preparing a response to an RFP to be issued by RSAC for
10  the 2010 U.S. and European Conferences. Lowe and Karen Daniele ("Daniele"),
11  Vice President, General Manager and Sponsorship Strategist, appeared at the
12  meeting on behalf of Nth, and Weber, Dean Hills ("Hills"), Bill Kahn ("Kahn") and
13  Mike Trovalli ("Trovalli") appeared on behalf of KCP. (AMF 7)

14      **C.**    **The terms of the Nth and KCP partnership.**

15      The terms of the parties' agreement, whether it is considered a contract,
16  partnership agreement, or joint venture agreement, were discussed during that Las
17  Vegas meeting.  During that meeting, there was a point in the discussion where the
18  Mr. Trovalli asked Mr. Lowe about how Nth intended to engage KCP around the
19  elements of the Conferences and how KCP would be engaged to provide actual
20  production services and support. Mr. Trovalli specifically referenced the General
21  Sessions and Exhibit Floor management, and alluded to the other elements of the
22  conference as well.  Mr. Kahn also stated that Nth was prepared to involve KCP
23  deeply in all elements of the conference with the exception of Installation &
24  Dismantling ("I&D") services, that it would not be worth the time and effort
25  investment for KCP to be involved in the preparation of the RFP.  In response, Mr.
26  Lowe was very clear that there were many streams of work and that each workstream
27  had its own revenue and integrated profit margin attached to it. He indicated that, ***as***
28  ***partners***, Nth Degree and KCP would share equally in those revenue streams with

1  the exception of I&D, which Nth Degree would handle through their other corporate
2  division.  Karen Daniele was present during that entire conversation and did not
3  object or refute Mr. Lowe's statements at that time or at any time subsequent to that
4  meeting. (AMF 8)

5          The terms of the partnership, Nth agreeing to share equally in the profits from
6  the work won from the proposal, made sense for both companies.  As Lowe stated to
7  KCP on several occasions, including at that Las Vegas meeting, that he believed
8  KCP brought components, skills and a skill set to the partnership that Nth lacked on
9  its own.  Lowe further stated at that meeting that he felt KCP's involvement was
10  crucial to them winning the RFP, and that he did not think Nth could retain the RSA
11  Conferences without KCP's help. (AMF 9) Lowe knew that the RSA Conference
12  team at Nth was incapable of delivering "strategic, high level" messages and Nth,
13  therefore, brought KCP into the fold specifically for that purpose.  (AMF 10)
14  Moreover, 50% of something is better than 100% of nothing, particularly since KCP
15  and Nth would be vying for additional areas of work (marketing/audience
16  acquisition) and would be attempting to sell RSAC on concepts to grow the
17  conferences that would result in greater total revenue generated from the
18  Conferences.  If the partnership could double the deliverables by winning marketing
19  and expanding event management, then Nth would lose nothing through the profit
20  sharing arrangement with KCP.

21          Nth further sold KCP on the idea that a winning proposal would result not
22  only in work for their combined partnership for the 2010 RSA Conferences, but
23  subsequent conferences as well based upon the fact that this was the first time RSAC
24  put the U.S. RSA Conference for bid since 2004. (AMF 11)

25                    **D.    Further evidence supporting the implied/oral partnership.**

26          On August 7, 2008, the day after the Las Vegas meeting, Lowe sent an email
27  to KCP principals with a copy to Daniele, stating, "I felt it [the Las Vegas meeting]
28  was a productive step towards a promising **partnership**." (Emphasis added.) (AMF

-4-

12)

On December 10, 2008, after Weber and Nth personnel met with Lapedis and other RSAC personnel, Weber sent an email to Lowe, Daniele, and Jeannie Blair of Nth, stating, "I felt that the meeting was very productive and set a good foundation for our continued dialogue around how our two companies can **partner** in a collaborative relationship for the RSA conference." (Emphasis added.) (AMF 14)

On February 4, 2009, after the RFP was issued, Lowe sent an email to Weber, asking, "What is the best way to present our **partnership** to [RSA Conference]?" (Emphasis added.) (AMF 15)

Although the words "partners", "partnership", "strategic partnership" and "strategic alliance" was used in emails from KCP to Nth, and vice versa, no one from Nth ever told anyone at KCP that Nth did not intend for it and KCP to actually be partners.  Also, no one at Nth ever told anyone at KCP that the only work that KCP would get would be work awarded for the RFI. (AMF 16)

### E.    RSAC issues the official RFP.

On January 26, 2009, RSAC forwarded the official version of the RFP to Nth, and shortly thereafter, members of Nth and KCP met in Marina Del Rey to brainstorm ideas as to how to attack the RFP.  The RFP initially sought bidders for event management and marketing work relating to the 2010 US and European Conferences.  (AMF 17) Later, RSAC would issue a separate RFI in which it carved out marketing work from the RFP.  The RFP called for a response consisting of two sections, Part 1, Event Specifications, which largely called for a logistical response with respect to multiple areas of work to be awarded, including marketing, and Part 2, the Business Acumen section, in which it was "incumbent upon [the RFP bidders] to demonstrate your ability to contribute to the strategic direction and growth of the Conferences.  What has your organization accomplished in this regard with other clients? What makes your organization different in this regard?"  The Business Acumen section asked the RFP bidders to respond to questions regarding their

1    experience in Europe and with other international events, challenges they have faced

2    in the European market and with multi-cultural, multi-lingual audiences, strategic

3    questions regarding RSAC's website, and their view of the conference landscape in

4    the year 2015. (AMF 18)

5    The RFP states, and KCP understood, that RSAC could, at its option,

6    incorporate all or part of the bidders' RFP proposal in any resulting contract for

7    work. (AMF 20) KCP also understood that KCP's and Nth's response to the RFP

8    (and the subsequently issued RFI) could lose the bidding process entirely, in which

9    case neither Nth nor KCP would be awarded any RFP or RFI work, and their

10    partnership would terminate. (AMF 21) KCP did not understand, and no where in the

11    RFP or RFI is it expressly written, that in the event a partnership or joint venture bid

12    for work, that RSAC could unilaterally elect to contract with only one of the partners

13    or joint venturers, at the exclusion of other partners or joint venturers, without the

14    permission of the excluded parties. (AMF 22)

15    In its UF No. 26, Nth refers to its Exhibit 14, an internal email from Weber to

16    KCP principals December 6, 2008, in which she states which subjects of the RFP

17    response Nth will "own" and which KCP will "own." The clarification is necessary

18    because Nth's UF No. 26 is ambiguous, and can be misinterpreted as Weber

19    identifying which areas of work Nth and KCP would own if and when Nth's and

20    KCP's proposal won the RFP process. As even Lowe admits, neither party had any

21    way of knowing precisely how the work would be awarded at that time because the

22    official RFP had not yet issued. (AMF 13)

23    **F.    The parties joint effort in preparing and submitting the response to**

24    **the RFP.**

25    Even before the RFP was issued, Lowe knew that it would include a "Business

26    Acumen" section and was acutely aware of the importance of this section. Lowe sent

27    an email to Weber on January 12, 2009, forwarding a note that he had sent to his

28    internal team of Daniele, Porter and Blair, in which he stated that they must approach

1  the RFP as if it were their entry into the business and not rest upon their past
2  accomplishments with RSAC, and that they must approach the Business Acumen
3  section differently than they had ever done before.  He spoke to Lapedis at length,
4  and "this is the area, besides the $$$ element, that she is going to pay the most
5  attention.  This area is where RSA hopes to get a glimpse into the conferences'
6  future, and we must be the team that provides the best picture and direction."  His
7  and his team's initial ideas were to provide RSAC with a narrative of what the events
8  will be like from an attendee's perspective 5-15 years from now, and strategic ideas
9  on how to extend the RSAC brand beyond the conferences themselves. (AMF 19)
10      On February 9, 2009, personnel from KCP and from Nth met in Marina Del
11  Rey for a brainstorming session to strategize as to how to respond to the RFP.
12  During the meeting, it was agreed that Nth would be primarily responsible for
13  Section 1 of the RFP, the Event Specifications section, since it was logistical in
14  nature, and Nth could readily respond to those questions because it had already been
15  doing that work, with the exception of marketing, since 2004.  It was agreed that
16  KCP would be primarily responsible for preparing the response to the marketing
17  subsection of Section 1.  (AMF 23) With respect to the Business Acumen section,
18  Lowe created a spreadsheet listing which partner would be responsible for which
19  questions. In reviewing the "Note" comments Lowe added after each question, KCP
20  was designated to start or provide all of the response for Question Nos. 2, 4, 5, 7, 9,
21  and 14.  Question Nos. 1, 10, 11, and 13 were to be jointly prepared or evenly split.
22  Nth was designated to start or provide all of the response to only 3, 6, and 12. (AMF
23  24)
24      **G.    The RFI issues splitting off the marketing work – Nth and KCP do
25          not alter their course.**
26      On April 1, 2009, RSAC issued the RFI for agencies interested in the
27  marketing work for the 2010 US RSA Conference. The RFI carved marketing out of
28  the RFP.  Now, parties that wanted to bid solely on event management work only

1   would respond to the RFP, parties that wanted to bid solely on marketing work
2   would respond to the RFI, and parties such as JMWW, GPJ, and the partnership of
3   KCP and Nth that were bidding for all the work would respond to the RFP and the
4   RFI.  Besides the work being offered, the RFI was significantly different than the
5   RFP in that it was only for marketing work for the 2010 U.S. RSA Conference, it did
6   not ask the marketing bidders any of the Business Acumen questions contained in
7   the RFP, and it did not seek information about the marketing bidders' European
8   experience and strategies. (AMF 25)

9       Nth contends that it never intended to share the RFP work or profits with
10  KCP, that Nth was bidding on the RFP work alone, and that KCP was bidding on the
11  RFI work alone.  However, Nth's contentions are controverted by the fact that even
12  after the RFI was issued, Nth continued to actively and intensively solicit and
13  request that KCP do the majority of the work on the Business Acumen section of the
14  RFP response, and even had it contribute to the Event Specifications section of the
15  RFP response. (AMF 26) If it was Nth's intent to secure the RFP work all to itself,
16  excluding KCP entirely, then the RFP called for Nth to have prepared the entire
17  responses to the Event Specifications section and the Business Acumen section on its
18  own. KCP's European experience, strategies, creative and long term planning would
19  only be relevant if KCP was going to be a part of the team that did the RFP work,
20  which Nth represented it would be.  (AMF 27) KCP never agreed, nor would it ever,
21  to ghost write the Business Acumen section on behalf of Nth and allow Nth to take
22  credit for KCP's experience and creative and strategic thinking.  KCP only
23  contributed to the RFP response after the RFI was issued on April 1, 2009,  because
24  it understood that it was partners with Nth with respect to the RFP and RFI response
25  and any work and profits that resulted from that response. (AMF 28)

26      By Lowe's own estimation, KCP contributed approximately 50% of the work
27  toward the Business Acumen section and approximately 15% of the work toward the
28  Event Management section. (AMF 29) KCP contends it contributed closer to 80% of

1   the work toward the Business Acumen section. (AMF 30) Although KCP authored
2   the response to the RFI, Mr. Lowe was a key advisor in its preparation.  Mr. Lowe
3   reviewed and approved of KCP's initial approach.  Mr. Lowe reviewed drafts of
4   KCP's RFI response and advised KCP to change certain words and phrases based on
5   his assessment of what, in his experience, Ms. Lapedis and Ms. Belikove of RSAC
6   would like and wouldn't like. (AMF 31) Both parties contributed significantly to the
7   RFP and RFI responses -- it was truly a joint effort. (AMF 32)

8        **H.    KCP prepares for and presents most of the partnership's face-to-**
9             **face presentation in support of the RFP before RSAC.**

10       If there was any confusion as to whether Nth and KCP were partners after the
11  written proposal was submitted, such confusion was completely cleared up after Nth
12  was invited back (as was JMWW and GPJ) for a face-to-face presentation ***in***
13  ***connection with the RFP*** to be made in front of the RSAC committee that would
14  select the winning proposal. In her e-mailed invitation dated May 13, 2009, with the
15  subject title, "RSA 2010: RFP Next Steps," from Lapedis to Lowe and Daniele,
16  Lapedis advised that the goal of the face-to-face presentation was to "showcase your
17  strategic thinking." Further, the email specifically requested "that the agency
18  members that will make up your day-to-day team be in the room and present portions
19  of the plan." (AMF 33)

20       By its subsequent actions, Nth absolutely, unequivocally confirmed that Nth
21  and KCP were partners with respect to the RFP proposal and any resulting RFP work
22  and profits.  Had Nth intended to keep the RFP work solely for itself, it could have
23  and would have prepared for the presentation on its own and would have made the
24  presentation entirely on its own.  RSAC was only interested in the strategic thinking
25  of the group that would win its RFP business and it wanted to see that group make
26  the presentation. (AMF 34) Instead, Nth tapped KCP not only to prepare the outline
27  for the presentation, but to also to present and sell the bulk of the message. In an
28  email dated May 18, 2009, from Lowe to Weber and Trovalli which Lowe blind

1  copied to members of the Nth team, Blair and Daniele, Lowe admitted that Blair,
2  Daniele and Porter were uncomfortable delivering that "strategic, higher level
3  message" required in the  presentation because that is not "who we 'are' to them"
4  and if they tried, the message would ring false with RSAC.  Lowe felt it was
5  important that KCP provide RSAC this type of message because KCP was new to
6  them and KCP "was brought into this team to exactly fill this void."  Lowe then
7  asked Weber if there was a way for KCP to prepare the presentation so that KCP
8  provided "all the strategic, big thinking direction" and allowed Nth's members to
9  provide Nth's historical knowledge. (AMF 35) That Nth requested that Weber, Hills
10  and Clare Sebenius prepare the outline for the presentation and attend and present
11  the "strategic, higher level message" to RSAC at the meeting served to further affirm
12  in KCP's mind the partnership between Nth and KCP with respect to the RFP
13  proposal and any work and profits that would result from their joint proposal. (AMF
14  36)

15       Weber, Hills, and Clare Sebenius were the persons most involved in creating
16  and developing the presentation to be made before RSAC on May 28, 2009.  Weber
17  estimates that KCP team members contributed approximately 90% of the work in
18  preparing the presentation, and Nth team members contributed approximately the
19  remaining 10% of the work.  KCP team members developed the outline, the creative
20  direction, 90% of the content, developed the powerpoint presentation, and
21  coordinated with Cathy Robertson in London to participate via conference call with
22  RSAC's London-based client. Nth Degree's role was to review and provide input to
23  the presentation only. (AMF 37)

24       At the presentation held on May 28, 2009, the "day-to-day team" selected to
25  present to RSAC by Nth included Weber and Hills from KCP, Clare Sebenus, a
26  freelance Creative Director retained by KCP to work on the proposal and any work
27  that flowed from it, and Lowe, Daniele, and Blair from Nth, and Bruce Porter, a
28  freelance Executive Producer regularly used by Nth as an Executive Producer for the

-10-

1  RSA Conferences. (AMF 38) During the presentation, Daniele estimates that KCP's
2  members presented for a greater amount of time than Nth's members. (AMF 39)
3  Weber estimates that KCP presented for approximately two hours of the approximate
4  two and one half hour meeting. (AMF 40) Lowe later described the presentation as
5  having gone off "perfectly." (AMF 41)

6      On June 5, 2009, KCP made its presentation in support of the RFI proposal.
7  (UF No. 60)  On or about June 17. 2009, KCP was notified that it was not awarded
8  the RFI marketing work. (UF No. 62)

9      **I.      Although the partnership's proposal won the RFP process, Nth**
10           **steals the work awarded for itself.**

11     Also on June 5, 2009, Lowe announced to KCP employees via e-mail that Nth
12  was chosen to continue with its management of the U.S. and European RSA
13  Conferences.  In his e-mail, he noted, "Be proud, we went head to head against the
14  Goliath's of the industry and came out on top." .  No mention was made of KCP's
15  contribution to the win, nor was KCP notified of it in that email or around that time.
16  (AMF 42)

17     Nth maintained that the RFP work was awarded to Nth only, as it was RSAC's
18  prerogative to do, that no partnership was ever formed, that it never intended to share
19  any work or revenue from the RFP work with KCP.  KCP contends that the parties
20  entered into an oral/implied partnership agreement which is fully supported by the
21  evidence, especially the parties' joint submission of the proposal and the stand-up
22  presentation, and that Nth agreed to share 50% of the work and the revenue resulting
23  from an RFP win with KCP.  The parties disagreed with each other, Nth gave KCP
24  nothing for its efforts in connection with the RFP, and this lawsuit followed.

25  **3.    LEGAL ARGUMENTS**

26     Summary judgment cannot be granted where there is a "genuine issue" as to
27  any "material fact." [FRCP 56(c)(2)] A fact is material if it might affect the outcome
28  of the suit under the governing substantive law. [*Anderson v. Liberty Lobby, Inc.*,

-11-

1  477 US 242, 248, 106 S.Ct. 2505, 2510 (1986); *United States v. Bloom*, 112 F3d

2  200, 205  (5th Cir. 1997)] A factual dispute is "genuine" where "the evidence is such

3  that a reasonable jury could return a verdict for the nonmoving party." *[Anderson v.*

4  *Liberty Lobby, Inc., supra*, 477 US at 248, 106 S.Ct. at 2510 (emphasis added)]

5       Rule 56 does not permit trial by affidavits. The court's function on a motion

6  for summary judgment is issue-finding, not issue-resolution. [*United States v. One*

7  *Tintoretto Painting,* 691 F2d 603, 606 (2nd Cir. 1982)] Thus, competent and specific

8  testimony by a single declarant may create a triable issue as to a material fact

9  although opposed by many other declarations to the contrary. [*United States v. One*

10  *Parcel of Real Property*, 904 F2d 487, 491–492 (9th Cir. 1990)].

11       The Court must view the evidence presented on the motion in the light most

12  favorable to the opposing party: "The evidence of the non-movant is to be believed,

13  and all justifiable inferences are to be drawn in his favor." [*Anderson v. Liberty*

14  *Lobby, Inc., supra*, 477 US at 255, 106 S.Ct. at 2513 (emphasis added)]

15       All reasonable inferences must be drawn in the opposing party's favor both

16  where the underlying facts are undisputed (e.g., background or contextual matters)

17  and where they are in controversy. At the summary judgment stage, the non-movant's

18  version of any disputed issue of fact is presumed correct. [*Eastman Kodak Co. v.*

19  *Image Technical Services, Inc.*, 504 US 451, 112 S.Ct. 2072 (1992); *T.W. Elec.*

20  *Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630–631 (9th Cir.

21  1987)]

22  **A.    THERE ARE GENUINE TRIABLE ISSUES OF MATERIAL**

23  **FACTS REGARDING THE EXISTENCE OF AN ORAL OR**

24  **IMPLIED PARTNERSHIP AGREEMENT OR JOINT VENTURE**

25  **AGREEMENT BETWEEN KCP AND NTH.  (2ND, 3RD, 4TH AND**

26  **5TH CLAIMS FOR BREACH OF ORAL/IMPLIED**

27  **PARTNERSHIP OR JOINT VENTURE AGREEMENTS)**

28  California Corporations Code section 16202(a) states, in relevant part, "the

-12-

1  association of two or more persons to carry on as coowners a business for profit
2  forms a partnership, ***whether or not the persons intend to form a partnership***."
3  (Emphasis added.) The distinction between joint ventures and partnerships is not
4  sharply drawn. A joint venture usually involves a single business transaction,
5  whereas a partnership may involve "a continuing business for an indefinite or fixed
6  period of time." [9 Witkin, Summary of Cal.Law, Partnership, § 17, at p. 416,
7  emphasis deleted.] From a legal standpoint, both relationships are virtually the same.
8  Accordingly, the courts freely apply partnership law to joint ventures when
9  appropriate. [*Orlopp v. Willardson Co.*, 232 Cal.App.2d 750, 754, 43 Cal.Rptr. 125
10 (1965)]

11         It has long been held that a joint venture or partnership may be formed orally
12 [*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 482, 286 Cal.Rptr. 40; *Nelson v.*
13 *Abraham* (1947) 29 Cal.2d 745, 749, 177 P.2d 931; *Holmes v. Lerner* (1999) 74
14 Cal.App.4th 442, 445, 88 Cal.Rptr.2d 130], or "assumed to have been organized
15 from a reasonable deduction from the acts and declarations of the parties" [*Swanson*
16 *v. Siem*, 124 Cal.App. 519, 524, 12 P.2d 1053 (1932); *Cochran v. Board of*
17 *Supervisors*, 85 Cal.App.3d 75, 81, 149 Cal.Rptr. 304 (1978)] whether or not the
18 persons intend to form one [Corp. Code §16202(a)], and its existence does not
19 depend on a formal written agreement. [*Cochran, supra,* 85 Cal.App.3d 75, 81, 149
20 Cal.Rptr. 304] The existence and scope of an oral or implied partnership agreement
21 or joint venture may be established by a preponderance of the evidence. [*Weiner,*
22 *supra,* 54 Cal.3d at 486, 286 Cal.Rptr. 40] **Here, at a minimum, there are triable**
23 **issues of material fact as to whether Nth and KCP formed an unwritten**
24 **partnership or joint venture requiring denial of summary adjudication on the**
25 **2nd, 3rd, 4th and 5th causes of action.**

26         The parties dispute what was discussed at the August 6, 2008 meeting in Las
27 Vegas, with KCP contending that the terms of the partnership were discussed, and
28 Nth denying that partnership terms were ever discussed despite Lowe's email to KCP

1   two days after the meeting in which he said he felt the Las Vegas meeting was "a
2   productive step towards a promising partnership," (AMF 12) and Lowe admitting
3   that he never told anyone at KCP that Nth never intended to enter into a partnership
4   with it.  (AMF 16)

5        Moreover, the acts of Nth and KCP confirm the existence of the partnership.
6   Even after the RFI was issued on April 1, 2009, KCP continued to prepare the
7   majority of the Business Acumen section for the response to the RFP even though
8   that information was not called for in the RFI.  As Lowe admitted, Nth sought KCP's
9   assistance precisely to do that type of work which he felt was vital to winning the
10  RFP business.  Additionally, Nth specifically designated Weber, Hills and Sebenius,
11  all KCP, as "members of the day-to-day team" for work from the RFP by requesting
12  that they present at the May 28, 2009 presentation before RSAC.  The presentation
13  allowed RFP bidders to showcase their strategic thinking.  Lowe admitted that it was
14  important for KCP team members to deliver the "strategic, higher level message" at
15  the RFP presentation because KCP was brought into the team to exactly fill that void
16  **and** Nth members were incapable of credibly doing so.

17              **1.       That KCP's principals used the term "partner" in**
18                    **other contexts in other situations is wholly irrelevant.**

19       Nth's argument that because KCP and its principals have used the term
20  "partner" in other contexts in other situations has some bearing upon the use of the
21  term with respect to KCP's relationship with Nth is without authority and is of
22  marginal, if any, relevance to this case.  A partnership may be formed whether or not
23  the persons intend to form one [Corp. Code §16202(a)].   A joint venture or
24  partnership may be"assumed to have been organized from a reasonable deduction
25  from the acts and declarations of the parties." [*Swanson, supra,* 124 Cal.App. at 524,
26  12 P.2d 1053; *Cochran, supra,* 85 Cal.App.3d at 81, 149 Cal.Rptr. 304] Not even
27  the knowledge of the legal effect of their acts on the part of the partners themselves
28  is essential to the creation of a partnership. [*Westcott v. Gilman,* 170 Cal. 562, 569,

1  150 P. 777 (1915); *Ramos v. Pacheco*, 64 Cal.App.2d 304, 308-309, 148 P.3d 704
2  (1944)]  Thus, the colloquial use of the term "partner" outside of the context of the
3  relationship between Nth and KCP does not disprove the existence of the agreement
4  between them.  Their actions spoke as loudly as their words.

**2.     There was a community of interest between Nth and
KCP until Nth usurped the RFP work for itself.**

7       From the time the RFP was issued until the moment Nth breached the
8  partnership agreement by keeping the RFP business for itself, there was a definite
9  community of interest in jointly preparing the response to the RFP and the RFI
10 between KCP and Nth.  Shortly after the RFP was issued, personnel from KCP and
11 Nth traveled across the country to meet in Marina Del Rey for a brainstorming
12 session to plan on how to attack the response.  From that point, tasks were assigned
13 to personnel from both companies addressing and contributing to sections regarding
14 Event Management, Marketing, and Business Acumen.  Even after the RFI was
15 issued which carved out the Marketing section from the RFP, and which did not
16 require Marketing bidders to provide a Business Acumen or European experience
17 and strategy elements to their response, KCP's assignments did not change – it
18 continued to work on the Business Acumen section and portions of the Event
19 Specifications section of the **RFP** response in addition to tackling the RFI response.
20 Moreover, in response to RSAC's request that the "day-to-day team" members
21 present at the May 28, 2009 presentation, Nth tapped Weber, Hills and Sebenius of
22 KCP not only to present at the meeting but to prepare the presentation as well.
23 Clearly, there was a community of interest between KCP and Nth in preparing the
24 best possible RFP response and winning that business.

**3.     The parties entered into contracts with third parties on
behalf of the partnership.**

27       Nth's argument in this regard is puzzling and of no utility to the issues at stake
28 here.  Nth admits that KCP entered into agreements with freelancers Clare Sebenius

-15-

1  and Annie Jenkel, amongst others, and Nth paid for their services in connection with

2  the RFP and RFI responses.  Nth entered into an agreement with Patty Anderson to

3  oversee the logistics in assembling the response.

4           **4.      Lowe and the Nth team managed preparation of the**

5                     **response to the RFI and RFP.**

6           Tasks were assigned to personnel at KCP and at Nth, but ultimately, the

7  overall preparation and assembly of the response to the RFP and the RFI was

8  managed by Lowe and by Patty Anderson.  Lowe served as a content editor,

9  reviewing all aspects of the response and having the final word on what went in and

10 what was cut, and Anderson ensured that every member from KCP and Nth met their

11 deadlines so that the proposal was completed and submitted on time.  Partners may

12 by agreement entrust the management of the business to one or more of the partners,

13 the making of such an agreement being itself an exercise of the requisite right of

14 control. [Corp. Code §16401(f); *Moulin v. Der Zakarian*, 191 Cal.App.2d 184, 190,

15 12 Cal.Rptr. 572 (1961); *Singleton v. Fuller*, 118 Cal.App.2d 733, 741, 259 P.2d 687

16 (1953); *Constans v. Ross*, 106 Cal.App.2d 381, 388-389, 235 P.2d 113 (1951)]

17          **5.      The parties agreed to share profits evenly - But even if**

18                   **there was no express agreement regarding profits, that**

19                   **is not evidence that there is no partnership.**

20          KCP and Nth agreed as partners to jointly prepare the response to the RFP and

21 RFI and to share equally in the profits from winning the RFP and/or RFI.  These

22 terms were discussed at the August 6, 2008, meeting in Las Vegas. Nth denies that

23 there was any agreement to share evenly the profits made from an RFP and/or RFI

24 win, but it offers no evidence of any alternative profit sharing arrangements.

25 Regardless, profit sharing is *prima facie* evidence of a partnership, but not a required

26 element of the definition of a partnership. [*Holmes v. Lerner, supra,* 74 Cal.App.4th

27 at 453-454, 457, 88 Cal.Rptr.2d 130 (An express agreement to divide profits is not a

28 prerequisite to prove the existence of a partnership.); Corp. Code §16202(a); Corp.

Code §16401(b)]

Moreover, in the absence of an agreement to the contrary, the law presumes that partners and joint adventurers intended to participate equally in the profits and losses of the common enterprise, irrespective of any inequality in the amounts each contributed to the capital employed in the venture with the losses being shared by them in the same proportions as they share the profits. [*Kovacik v. Reed*, 49 Cal.2d 166, 315 P.2d 314 (1957)]  Where parties did not agree on subject of their share of profits and losses, such shares were equal. [*Albertoni v. Alberti*, 104 Cal.App. 633, 286 P. 473 (1930)]

Here, the trier of fact will be left with two choices: (1) to believe KCP with respect to the profit sharing arrangement discussed in Las Vegas, which would constitute *prima facie* evidence of a partnership, or; (2) determine that there was an absence of an agreement regarding profit sharing, which would result in a legal presumption that Nth and KCP intended to participate equally in the profits and losses of the shared enterprise, i.e., the work that flowed from winning the RFP.

**B.    BECAUSE THERE ARE TRIABLE ISSUES OF MATERIAL FACT REGARDING THE EXISTENCE OF PARTNERSHIP/JOINT VENTURE, THERE ARE TRIABLE ISSUES OF FACT REGARDING THE (7TH) CLAIM FOR BREACH OF FIDUCIARY DUTY.**

"Like partners, joint venturers are fiduciaries with a duty of disclosure and liability to account for profits." [9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership, § 19, p. 418]

Here, Nth's motion relies entirely upon whether a triable issue of material fact exists as to whether KCP and Nth formed a partnership or joint venture.  In the event such a triable issue of material fact exists, this cause of action must stand because Nth made no attempt to argue in the alternative that Nth did not breach its fiduciary duties to KCP.  It has conceded, therefore, this cause of action for purposes of a

1  motion for summary judgment.

2        **C.**    **THE CONTRACT WAS SUFFICIENTLY CERTAIN TO**
3                **PROVIDE A BASIS FOR DETERMINING THE EXISTENCE OF**
4                **A BREACH AND FOR GIVING AN APPROPRIATE REMEDY**
5                **(1ˢᵗ CLAIM FOR BREACH OF CONTRACT).**

6       "Under California law, a contract will be enforced if it is sufficiently definite
7  (and this is a question of law) for the court to ascertain the parties' obligations and to
8  determine whether those obligations have been performed or breached." [*Ersa Grae*
9  *Corp. v. Fluor Corp.*, 1 Cal.App.4th 613, 623, 2 Cal.Rptr.2d 288 (1991)] "To be
10  enforceable, a promise must be definite enough that a court can determine the scope
11  of the duty[,] and the limits of performance must be sufficiently defined to provide a
12  rational basis for the assessment of damages." [*Ladas v. California State Auto. Assn.*,
13  19 Cal.App.4th 761, 770, 23 Cal.Rptr.2d 810 (1993); *Robinson & Wilson, Inc. v.*
14  *Stone*, 35 Cal.App.3d 396, 407, 110 Cal.Rptr. 675 (1973)] "The terms of a contract
15  are reasonably certain if they provide a basis for determining the existence of a
16  breach and for giving an appropriate remedy." [Rest.2d Contracts, § 33, subd. (2);
17  *accord*, *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 811, 71
18  Cal.Rptr.2d 265 (1998)]

19       Here, the terms of the contract between Nth and KCP are simple – If KCP
20  assisted Nth in jointly preparing a response to the RFP, and the RFI once it was
21  carved out of the RFP, the parties would share in any work and profits realized from
22  winning the RFP and/or the RFI.  These terms are certain enough to provide the basis
23  for determining the existence of a breach (Nth's refusal to share with KCP any work
24  and profits it realized from winning the RFP) and for giving an appropriate remedy
25  (50% of all profits realized from the 2010 U.S. RSA Conference, the 2010 European
26  RSA Conference, and each subsequent RSA Conference that Nth has managed, or is
27  likely to manage, as a result of winning the RFP).

28       The case of *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 45 Cal.Rptr.3d

1   692 (2006) cited by Nth is inapposite.  In that case, Bustamante attempted to form a
2   venture between himself and Intuit involving the marketing of Intuit's Quicken and
3   Quick Books software in Mexico.  Intuit engaged in exploratory "phases," but both
4   parties understood that they could not or would not launch "Intuit Mexico" without
5   first securing minimum financial commitments from third parties.  Bustamante was
6   never able to secure third party financing, so Intuit ended their relationship and
7   Bustamante sued for breaching their agreement to form and launch Intuit Mexico,
8   and for wrongful dissociation from their joint venture.  Intuit moved for and was
9   granted summary judgment on the grounds that the terms of the purported contract
10  were uncertain.  The court of appeal affirmed, holding that the parties always
11  understood that it would not be possible to form and launch Intuit Mexico without
12  significant third party investment.  "Clearly, there was no expression of mutual
13  consent to create a company without investor financing..."  (*Ibid.* at 213.)

14  To the extent the case at hand is in any way analogous to *Bustamante*, it would
15  be with respect to the existence of a condition precedent to formation of the contract.
16  In *Bustamante*, there was no way an enforceable contract could form unless third
17  party financing was found.  In the case at hand, the terms of the contract were made
18  clear at the meeting held in Las Vegas on August 6, 2008.  However, formation of
19  the contract was contingent upon RSAC issuing the RFP.  Until RSAC issued the
20  RFP, Nth and KCP could not prepare their proposal and could not win the business.
21  The parties could have talked and planned all they wanted, but if RSAC never issued
22  an RFP, no contract would ever have been formed.  The difference between this case
23  and *Bustamante* is that here, the condition precedent occurred – RSAC eventually
24  issued the RFP, thereby establishing the enforceable contract between Nth and KCP.

25          **1.    The Statute of Frauds is Not Applicable - The contract could**
26                  **have been performed within a year.**

27  "[I]f a condition terminating a contract may occur within one year of its
28  making, then the contract is performable within a year and does not fall within the

-19-

1  scope of the statute of frauds. This is true even though performance of the contract
2  may extend for longer than one year if the condition does not occur." *[Foley v.*
3  *Interactive Data Corp.*, 47 Cal.3d 654, 673, 254 Cal.Rptr. 211(1988)]

4       Here, the unwritten agreement between Nth and KCP survives the statute of
5  frauds because a condition terminating it, i.e., RSAC completely rejecting their joint
6  response to the RFP and RFI, could have occurred within one year of the making of
7  the agreement. The contract between Nth and KCP began on January 26, 2009,
8  when the condition precedent to the contract, official issuance of the RFP occurred.
9  RSAC was to determine the winner of the RFP process in June of 2009. If Nth and
10  KCP had lost both the RFP and the RFI, then their contract would have terminated
11  because there would have been no work or profits to share. Thus, the contract
12  survives the statute of frauds.

13       **D.     THE CLAIM FOR BREACH OF THE IMPLIED COVENANT OF**
14              **GOOD FAITH AND FAIR DEALING (8TH CLAIM) SURVIVES**
15              **BECAUSE A CONTRACT EXISTS AND NTH TOOK UNFAIR**
16              **ADVANTAGE OF KCP.**

17       Good faith and fair dealing require that neither party to agreement for division
18  of profits, whether contract is one of copartnership, joint venture, of employment,
19  may be permitted to take unfair advantage or enjoy greater rights than terms of
20  agreement call for, one of them may not obtain secret profit or undue benefit, and
21  one intrusted with another's rights is charged with duty to guard such rights with
22  utmost good faith. [*Nelson v. Abraham*, 29 Cal.2d 745, 177 P.2d 931 (1947)]

23       Assuming that the Court determines there is at least a triable issue of material
24  fact as to the existence of a contract between KCP and Nth, Nth's only other defense
25  to this cause of action is that there can be no breach of the implied covenant because
26  Nth dealt fairly with KCP at all times, it assisted KCP in inviting it to participate in
27  the RFP process for the marketing work, it assisted KCP in preparing its response,
28  and it is not Nth's fault that RSAC awarded work to Nth and not KCP.

-20-

1      To the contrary, KCP contends and will prove at trial that Nth took unfair
2  advantage of KCP in inducing it to do significant, material work in preparing at least
3  half, if not most, of the Business Acumen section and in preparing and presenting
4  most of the May 28, 2009 face-to-face presentation (and all of the work leading up to
5  both), both of which were required elements of the RFP process, and then excluding
6  KCP from any participation in the work and profits from work associated with the
7  jointly prepared RFP proposal after it was awarded.

8      **E.      NTH HAS BEEN UNJUSTLY ENRICHED BY KCP'S**
9              **PREPARATION OF THE BUSINESS ACUMEN SECTION TO**
10             **THE WRITTEN RFP PROPOSAL AND ITS PRESENTATION OF**
11             **THE STRATEGIC THINKING AT THE FACE-TO-FACE**
12             **PRESENTATION THAT WON NTH THE RFP BUSINESS. (9TH**
13             **CLAIM)**

14     To succeed on a claim of unjust enrichment requires the "receipt of a benefit
15  and [the] unjust retention of the benefit at the expense of another." *[Peterson v.*
16  *Calico Partnership*, 164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008)
17  (internal cites omitted)]  One who receives such a benefit may be required to make
18  restitution to another. [See, e.g., *First Nationwide Savings v. Perry*, 11 Cal.App.4th
19  1657, 1662, 15 Cal.Rptr.2d 173 (1992)]

20     Here, Nth received the benefit of KCP's significant contribution to the
21  Business Acumen section of the RFP proposal, 15% of the Event Specification work
22  that went into the RFP proposal, and KCP's preparation of the face-to-face 5/28/09
23  presentation made by the "day-to-day team" that would do the work awarded through
24  the RFP process.  Nth deceived KCP into doing work for which Nth never intended
25  for it to benefit, and it deceived RSAC by falsely representing KCP's experience and
26  creative and strategic ideas as its own in the written RFP proposal and face-to-face
27  presentation.  For its deception, at the expense of KCP, it must be required to make
28  restitution to KCP.

1    **F.     KCP'S PROMISSORY ESTOPPEL CLAIM SURVIVES AS NTH**
2    **CLEARLY INDUCED KCP TO RESPOND, IN WRITING AND IN**
3    **PERSON, FOR THE RFP WORK.  (6TH CLAIM)**

4    The doctrine of promissory estoppel provides that "[a] promise which the
5    promisor should reasonably expect to induce action or forbearance of a definite and
6    substantial character on the part of the promisee and which does induce such action
7    or forbearance is binding if injustice can be avoided only by enforcement of the
8    promise." [*C & K Engineering Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 6, 151
9    Cal.Rptr. 323 (1978) (citing Section 90 of the Restatement of Contracts)]

10    Here, the promise made by Nth was that if KCP assisted in jointly preparing
11    the response to the RFP, and their response won, that KCP and Nth would share in
12    the work and profits from the win.  Through that promise, Nth expected to, and did,
13    induce KCP to jointly prepare the parties' joint RFP response, which included
14    preparing 50-80% of the Business Acumen section, roughly 15% of the Event
15    Specifications section, and preparing and presenting a majority of the parties'
16    5/28/09 face-to-face presentation before RSAC in support of their RFP proposal,
17    None of the work relating to the Business Acumen section, the Event Specifications
18    section, or the 5/28/09 presentation were asked for or required by the RFI.  They
19    were only required of bidders for the RFP work.

20    **G.     THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER**
21    **NTH'S ACTIONS WERE UNFAIR, UNLAWFUL AND/OR**
22    **FRAUDULENT IN VIOLATION OF BUSINESS &**
23    **PROFESSIONS CODE § 17200 (10TH CLAIM)**

24    Business and Professions Code section 17200 defines unfair competition as
25    "any unlawful, unfair or fraudulent business act or practice...." "The 'unlawful'
26    practices prohibited by section 17200 are any practices forbidden by law, be it civil
27    or criminal, federal, state, or municipal, statutory, regulatory, or court made. [*People*
28    *v. McKale*, 25 Cal.3d 626, 632, 159 Cal.Rptr. 811 (1979)] 'Unfair' simply means any

-22-

1   practice whose harm to the victim outweighs its benefits. [*Motors, Inc. v. Times*
2   *Mirror Co.*, 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980)] 'Fraudulent,' as
3   used in the statute, does not refer to the common law tort of fraud but only requires a
4   showing members of the public ' "are likely to be deceived." ' [*Bank of the West v.*
5   *Superior Court*, 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538 (1992)]" [*Saunders v.*
6   *Superior Court*, 27 Cal.App.4th 832, 838-839, 33 Cal.Rptr.2d 438 (1994)]

7        Here, Nth's acts can be considered unfair, unlawful or fraudulent.  They were
8   unfair in that Nth reneged on its agreement with KCP that in exchange for jointly
9   preparing and submitting the proposal in response to the RFP that KCP would share
10   in the work and profits won through the proposal.  Nth used KCP for its skills,
11   experience, and creative and strategic ideas in responding to the RFP, in the written
12   proposal and in-person presentation, deceiving KCP into thinking it would share in
13   the subsequent work and profits and deceiving RSAC into awarding Nth the work
14   based upon a Business Acumen section and presentation that more accurately
15   reflected KCP's strategic and creative thinking than that of Nth.

16        Nth's acts can be considered "unlawful" and "fraudulent" in that they
17   constituted a violation of Civil Code §1624, the California definition of fraud and
18   deceit.  According to §1624, actual fraud exists consists in any of the following acts,
19   committed by a party to the contract, with intent to deceive another party thereto, or
20   to induce him to enter into the contract: (1) The suggestion, as a fact, of that which is
21   not true, by one who does not believe it to be true; (2) The positive assertion, in a
22   manner not warranted by the information of the person making it, of that which is
23   not true, though he believes it to be true; (3) The suppression of that which is true, by
24   one having knowledge or belief of that fact; (4) A promise made without any
25   intention of performing it; or, (5) Any other act fitted to deceive."  As demonstrated
26   hereinabove, Nth was a party to the contract with KCP, To the extent that Nth denies
27   that it ever intended to share in the work and profits derived from winning the RFP,
28   Nth violated the fraud statute by inducing KCP to jointly prepare and submit the

-23-

1 | response to the RFP.

2 | **4.     CONCLUSION**

3 | For all of the reasons stated above, and because so many of the "facts" listed
4 | in Nth's Statement of Uncontroverted Facts are either disputed and unsubstantiated
5 | by the evidence cited by Nth, Nth's motion for summary judgment and/or
6 | adjudication must be denied in its entirety.

7 |

8 |                                        Respectfully submitted,

9 | DATED: March 14, 2011                  THE ALTMAN LAW GROUP

10 |

11 |                             BY: _____
12 |                                 BRYAN C. ALTMAN
                                     DAVID J. MASUTANI
13 |                                 Attorneys for Plaintiff,
                                     KAHN CREATIVE PARTNERS, INC.

-24-